**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

Tina Silvers,

<em>Plaintiff</em>,

v.                                                         **Case No. 3:15-cv-087**
                                                           **Judge Thomas M. Rose**

Clay Township Police Department, *et al*.,

<em>Defendants</em>.

---

**ENTRY AND ORDER GRANTING IN PART AND DENYING
IN PART MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS BOARD OF TRUSTEES OF CLAY
TOWNSHIP, CLAY TOWNSHIP, JOHN VANGUNDY, DOC.
38, MOTION FOR SUMMARY JUDGMENT BY
DEFENDANT ANTHONY SCOTT, DOC. 39, AND MOTION
FOR SUMMARY JUDGMENT BY DEFENDANT JOHN
SIMMONS. DOC. 40. THE COURT ALSO FINDS MOOT
AND DENIES IN PART PLAINTIFF TINA SILVERS'S
MOTION FOR THE COURT TO DISREGARD PORTIONS
OF DOC. 45 THAT EXCEED THE SCOPE OF DOC. 38
(CLAY TOWNSHIP AND VANGUNDY'S MSJ) AND DOC.
43 (SILVERS'S MEMORANDUM IN OPPOSITION);
OBJECTION TO EVIDENCE IN SUPPORT OF DOC. 45;
AND ALTERNATIVE MOTION TO FILE SUR-REPLY.
DOC. 48. SUMMARY JUDGMENT IS AWARDED ON
PLAINTIFF'S CLAIMS ARISING UNDER FEDERAL LAW.
THE REMAINDER OF PLAINTIFF'S CLAIMS ARE
REMANDED TO THE MONTGOMERY COUNTY COURT
OF COMMON PLEAS.**

---

Pending before the Court are Motion for Summary Judgment by Defendants Board of

Trustees of Clay Township, Clay Township, John VanGundy, Doc. 38**,** Motion for Summary

Judgment by Defendant Anthony Scott, Doc. 39, Motion for Summary Judgment by Defendant

1

John Simmons, Doc. 40, and Motion to Disregard Portions of Doc. 45 and Object to Evidence re 45 Reply to Response to Motion by Plaintiff Tina Silvers. Doc. 48.   Movants request that the Court award them summary judgment on all counts of Plaintiff Tina Silver's Second Amended Complaint. Doc. 23.

Plaintiff's Second Amended Complaint names as defendants Clay Township, the Board of Trustees of Clay Township, as well as John VanGundy, Anthony Scott and John Simmons both individually and in their official capacities. Doc. 23.   All Defendants are charged with sex discrimination and sexual harassment in violation of Ohio Revised Code § 4112 and the Civil Rights Act of 1990, 42 U.S.C. § 2000e, denial of Equal Protection in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.   Silvers's claims include negligent hiring and retention of VanGundy and Scott as well as intentional infliction of emotional distress.   She also asserts The Board of Trustees and policy-making officials of Clay Township deprived Silvers of constitutional rights by means of governmental policies, practices, customs, and decisions, officially adopted and promulgated by their officers, and by the failure to properly train the individual Defendants. Finally, she seeks attorney fees, costs and other expenses.   *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

## I.    Background

Plaintiff Tina Silvers graduated from the Great Oaks Police Academy in 1997. Silvers Dep., Doc. 28-1, PageID 301.   She worked in several police departments and private security jobs before joining Clay Township Police Department in August 2007 as an Auxiliary Officer without pay. Id. at 304–28, 334.   She joined Clay Township at the suggestion of Chief Don Perkins. Id. at 333.   Silvers had previously dated Chief Perkins, but that relationship ended in 2005 and they

remained friends. Id. at 338.[1]  Auxiliary officers were required to undergo field training, and Silvers was assigned to Defendant John VanGundy, who was then an officer, as her Field Training Officer. Id.   Silvers resigned in December 2008 due to an injury at another job. Id. at 330, 338–38.

After resigning from Clay Township, Silvers remained friends with VanGundy. Silvers Dep., Doc. 28-1, PageID 347.   In 2012, "sometime before October," PageID 346, l. 10, VanGundy suggested to Silvers that she come back to work at Clay Township. Silvers Dep., Doc. 28-1, PageID 345; Perkins Aff. ¶ 3.   By that point, VanGundy had been promoted to Detective and indicated that he had enough pull, as a Detective, to get her hired on as a paid Police Officer, though she would have to start again as an Auxiliary Officer without pay. Silvers Dep. at PageID 347.   While paid Police Officer positions were hired by the Board of Trustees, the Trustees followed the recommendations of the Chief and VanGundy recommended to the Chief that Silvers be brought back to Clay Township. Perkins Aff. ¶ 6.   VanGundy said he would make sure she got the job, but that she would have to "give it up" if hired. Silvers Dep., Doc. 28-1, PageID 349.   He had previously told Silvers that his "bucket list" included having sex with an older woman. Id. at 350.   Silvers accepted an Auxiliary Officer position, but never had sex with VanGundy. Id. at 352.

Between Silvers's two terms as an Auxiliary Officer, she and VanGundy occasionally texted and talked. Silvers Dep., Doc. 28-1, PageID 350. They never had a sexual relationship, though they each texted a nude photo of themselves to each other in 2010, the period between Silvers's two Auxiliary Officer stints. Id. at 352; Silvers Aff. ¶ 8.   When VanGundy discussed Silvers's return to Clay Township, he pulled a folder out of his desk containing sexually explicit

---

[1] Silver's relationship with the Chief was one of several curious topics when Silvers was interviewed by VanGundy. PageID 882-83.

photos of women with whom claimed to have had sex. Silvers Dep., Doc. 28-1, PageID 353. He took the photo she texted him two years earlier from the folder and said he now trusted her but did not trust the other women. Id. at 354.

Silvers began her second term as Auxiliary Officer in October 2012. Silvers Dep., Doc 28-1, PageID 361–62. She was required to go back through the field training program and was assigned to Defendant Anthony Scott as her Field Training Officer. Id. at 362. Field training had a guideline of 240 hours of "on-the-road" training. Perkins Aff. ¶ 4. Actual training could be less depending on an officer's prior experience. Id. Due to her prior experience with the Clay Township Police, Perkins expected Silvers to complete her training in under 240 hours. Id. auxiliary officers do not receive road-training credit hours for paperwork around the office or other assignments within the office. VanGundy Dep. Doc. 30-1, PageID 780.

Silvers was initially scheduled two or three days a week for field training with Scott. Id. at 366. However, it was not uncommon for Silvers to appear for field training and be told by Scott that they were not going on the road because he had too much to do in the office, denying Silvers from additional field training. Id. at 368; Scott Dep., Doc. 31-1, PageID 933. Meanwhile, VanGundy asked her to perform work for which she did not receive credit toward her field training. Id. at 367.

Chief Perkins retired on December 29, 2012. Silvers Dep., Doc. 28-1, PageID 377. By then, VanGundy had been promoted to Lieutenant and Scott had been promoted to Sergeant. Prior to Perkins's departure, she had not experienced any significant problems with Scott or VanGundy. Id; Silvers Aff. ¶ 3. In February 2013, Defendant John Simmons was hired as Safety Director, serving a dual role as Chief of Police. Simmons Dep. PageID 667. Once Chief Perkins was gone, Silvers alleges Scott and VanGundy began subjecting Silvers to a sexually hostile work

4

environment in which she was treated differently than male officers. Silvers Aff. ¶ 3. Silvers alleges Simmons joined Scott and VanGundy in this treatment and allowed Scott and VanGundy to continue in it. Id.

On one occasion, in March 2013, Silvers used the restroom at work and urinated blood. Silvers Dep., Doc. 28-1, PageID 384.   She informed VanGundy she was sick that morning, but it had gotten worse because she was urinating blood and needed to go to the hospital. Id.   Rather than handle the matter discreetly, VanGundy yelled to Scott, in front of Simmons and others, "she's pissing blood." Id. at 386.   Scott said "are you sure it's not your monthly?" Id.   Silvers said "I think I'd know the difference." Id.   She then left and went to the hospital. Silvers Aff. ¶ 9. Thereafter, Scott mocked her by saying "my name is Tina and my pussy hurts." Silvers Dep., Doc. 28-2, PageID 539.   He said it numerous times over the course of her employment, even after she told him it offends her. Id. at 539–40.

On another occasion, new pants were ordered for the officers, and Scott asked Silvers what size panties she ordered. Silvers Dep., Doc. 28-1, PageID 393.   She answered him, referring instead to her pant size. Id.; Silvers Aff. ¶ 4.   That same day he eschewed the colloquial "there's more than one way to skin a cat," instead asking her, if she wiped her ass the same as the rest of them, front to back or side to side, and whether that was the funk he smelled. Silvers Dep., Doc 28-2, PageID 541.

Silvers also contends that once, in July or August of 2013, after she had responded to an auto accident, Scott arrived without his radio and yanked Silvers's microphone, clipped to her chest.   A few seconds after he began pulling her around by it, she gave it to him. Silvers Dep., Doc. 28-2, PageID 444–45, 553.   He instructed her to move traffic cones so stopped traffic could proceed. Id. at 445.   As Silvers was moving the last of the traffic cones, Scott screamed at her "get

5

back in your fucking car. Fucking idiot." Id. Silvers asserts this incident, witnessed by other officers, firefighters, and motorists, was demeaning and embarrassed and humiliated her. Id. at 447–49.

Scott also tried to write-up Silvers for missing work when her sister passed away from cancer and her absence had been approved in advance. Silvers Aff. ¶ 5. After Silvers began losing weight because of his harassment of her, he would ask "what's the matter, do you have cancer or something?" Id.

On Silvers's last day as Auxiliary Officer with the Clay Township Police, Scott ordered Silvers to pick up a prisoner in Preble County. Silvers Dep., Doc. 28-2, PageID 457. When she arrived, she had to wait for the Lewisburg unit to bring the prisoner. Id. at 458. However, contraband was found on the prisoner, so the pick-up never occurred. Id. Silvers drove back to the office and Scott demanded she perform other work. Id. at 459. Silvers took a meal break and performed other work. Id. Upon her return, Scott screamed at her for using "his" gas and putting miles on "his" car and only accomplishing three vacation checks. Id. at 459–60. He screamed that that was "fucking unacceptable," that she "had enough time for this shit," and screamed "why don't you just tell me I'm sorry, sir, and I'll fucking do better next time?" Id. Silvers tried to explain the problems she encountered that evening and Scott kicked a trash can that hit her. Id.

The can incident so upset Silvers that she "forgot about [mandatory] training" she had signed up for. Silvers Depo. PageID 462, ll. 1–7.

Silvers wanted to report Scott's behavior to the Board of Trustees, but felt blocked from doing so. Silvers Dep., Doc 28-1, PageID 387. After Simmons was appointed Safety Director, officers were permitted to speak to Trustees with approval after submitting a written request on a pre-printed form that was kept in the road room. Id. at 388–89. Simmons also testified that a

6

written request addressed to him was required for any officer to see the Trustees. Simmons Dep.,
Doc. 29-1, PageID 733. While there was no written policy requiring the requests to go through
Simmons, he confirmed that that was the practice in place. Id. at 734. Silvers completed the form
twice requesting to meet with the Trustees, once in March 2013 and once in July or August 2013.
Id. at 388. Simmons told her she was denied from seeing the Trustees. Id. at 391.

At one point, Silvers interviewed with the Brookville Police Department.[2] According to
Silvers, during the interview Brookville Chief of Police Doug Jerome "just come right out and
asked me—he said, I just need to ask you this: Was you that female on the highway?" Silvers
Depo., PageID 467, ll. 2–5. Silvers broke down and then confided some of the problems she was
experiencing with the Clay Township Police Department. Jerome Aff. ¶ 3.4. Later, Jerome and
Simmons rode together to a meeting, PageID 469, and Jerome told Simmons that he should have a
conversation with Silvers about things that are going on with her at work. Id. at ¶ 4. Simmons
describes this conversation as revealing that Silvers "disparaged the [Clay Township Police
Department] field training to another police agency." PageID 760. "This prompted Simmons to
approach Silvers and say "We need to talk about some of the things that you're going through but
you're going to have to follow your chain of command." Silvers Dep., Doc. 28-2, PageID 470.
According to Silvers, because Silvers's "chain of command" was Scott and Simmons who had
previously denied her from seeing the Trustees, she responded "it is what it is." Id. at 470–71, 488.

Scott wrote a Final Evaluation Report for Silvers dated September 16, 2013. Scott Dep.,
Doc. 31-1, PageID 948. On September 16, 2013, Scott wrote a memo to Simmons requesting that
Silvers be released from the probationary program. Simmons Dep. Ex. 4, Doc. 29-2, PageID 757.

---

[2] The Court sees nothing in the record stating when this took place, only that Simmons learned of it from Jerome "days before" Silvers was terminated. PageID 761, ¶ 28.

VanGundy called Silvers and told her she needed to sign off on two write ups and probationary release. Silvers Dep., Doc. 28-2, PageID 529.

On September 19, 2013, Silvers called Clay Township Police Department to talk to VanGundy about her probationary release. Id. VanGundy was not there, so she talked to Simmons. Id. He got angry with her when she tried to discuss the reasons for the probationary release and told her she is being terminated. Id.

There was a policy stating that employees experiencing sexual harassment "should" report the harassment to the Board of Trustees. There is no evidence that this policy was given to Silvers or reviewed with her. PageID 521–23, Scott Dep., Doc. 31-1, PageID 971–76. She also denies knowing it existed. Silvers Dep., Doc 28-2, PageID 523 ("I did not know about this [i.e. the sexual harassment policy]. I can tell you that they was doing updates and having sign offs of policies and procedures that was changing. That was constantly happening after [Van Gundy and Scott] took over.")

After her termination, Silvers filed a Charge of Discrimination with the Ohio Civil Rights Commission. Simmons Aff. ¶ 31; Doc. 29-2 PageID 761. As a result, Scott was demoted for his conduct on the highway, placed on probation for one year, and sent to anger management and sensitivity training. Simmons Aff.; Doc. 29-2 PageID 761, ¶31. Simmons described Scott's behavior as "egregious" and recommended demotion to the Board of Trustees. Simmons Dep., Doc. 29-1, PageID 735–36. Simmons was aware of Clay Township's progressive discipline system, but believed Scott's conduct toward Silvers was serious enough to bypass lower steps and warranted a demotion. Id.

Silvers asserts Scott has a history of aggression that the Clay Township Police overlooked. Scott was released from his probation at Brookville Police Department, his last job in law

enforcement before joining Clay Township, because he was too aggressive. Scott Dep., Doc. 31-1, PageID 917, 920. On July 2, 2010, the Brookville Chief wrote on Clay Township's reference check that Scott was "aggressive patrol" and not eligible for rehire. Scott Dep., Ex. 8, Doc. 31-2, PageID 993. On May 2, 2012, while employed at Clay Township, Scott pled guilty to Disorderly Conduct stemming from an incident at a dog park. VanGundy Dep., Ex.7, Doc. 30-2, PageID 880. Scott pulled a gun on a dog at the dog park with the dog's owner present. VanGundy Dep., Doc. 30-1, PageID 816–18. VanGundy recommended that a written disciplinary action remain in Scott's personnel file for six to nine months. Id. at 818–19.

Plaintiff filed a charge with the Ohio Civil Rights Commission ("OCRC") on September 19, 2013, which was duly filed with the Equal Employment Opportunity Commission ("EEOC"), a true and accurate copy of which is attached herein for this Court's reference as Exhibit A.1 On July 17, 2014, the OCRC issued a letter of determination. Based upon its investigation, the OCRC found that Plaintiff was released during probation for performance issues. (OCRC Determination, Exhibit B.) The OCRC ultimately found no probable cause for the Commission to issue a complaint against the Clay Township Police Department for an unlawful discriminatory practice. (Id.) Accepting the findings of the OCRC, the EEOC issued its Dismissal and Notice of Rights. (Doc. 12-1, PageID 152.)

Within 90 days of the EEOC's concurrence in the dual charge, Silvers filed suit in the Montgomery County Court of Common Pleas on January 6, 2015. This was removed to this Court on March 4, 2015. Doc. 1. Now pending before the Court is Plaintiff's Second Amended Complaint, which names as Defendants Clay Township, the Board of Trustees of Clay Township, plus John VanGundy, Anthony Scott and John Simmons both individually and in their official capacities. Doc. 23. Plaintiff's federal claims in her Second Amended Complaint include charges

9

against all Defendants for sex discrimination and sexual harassment in violation of the Civil Rights Act of 1990, 42 U.S.C. § 2000e, denial of Equal Protection in violation of the Fourteenth Amendment and 42 U.S.C. § 1983 by Sergeant Scott, Lieutenant VanGundy, and Safety Director Simmons.   The Seventh Claim asserts The Board of Trustees and policy-making officials of Clay Township deprived Silvers of her constitutional rights by means of unconstitutional governmental policies, practices, customs, and decisions, officially adopted and promulgated by their officers, and by the failure to properly train the individual defendants.   Finally, she seeks attorney fees, costs and other expenses.

## II.   Standard

A moving party is entitled to summary judgment if the pleadings, the discovery and the disclosure materials on file, and any affidavits "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue for trial where the record "taken as a whole could not lead a rational trier of fact to find for the non–moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   We must ultimately decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one–sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986).   In doing so, the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party. *Hawkins v. Anheuser–Busch, Inc*., 517 F.3d 321, 332 (6th Cir. 2008).

## III.   Plaintiff's Claims for Sex Discrimination

Plaintiff asserts a claim for sex discrimination against all Defendants. Sec. Am. Compl., Doc. 23, PageID 247–48.   In order to prove a claim of gender discrimination, Plaintiff must either present direct evidence of discrimination or prove a *prima facie* case under the *McDonnell*

*Douglas* analysis.   In a direct evidence case, the employee must present direct evidence that the employer acted with a discriminatory motive. *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 172 (6th Cir. 2004).   In the instant case, there is no allegation of direct evidence of discrimination.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 428 (1981), allow a plaintiff who lacks direct evidence to survive a motion for summary judgment by establishing a prima *facie case* for her claim.   Once the plaintiff meets this burden, the burden of production then shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Burdine*, 450 U.S. at 253.   If the defendant meets its burden, the plaintiff must then demonstrate that the employer's proffered justification is merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804.   The plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Id*. at 1084.

Thus, to establish a *prima facie* case of sex discrimination by the indirect evidence method, a plaintiff must demonstrate that "(1) she was a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) other individuals outside of the protected class received more favorable treatment." *Ndene v. Columbus Acad*., No. 209-CV-892, 2011 WL 829189, at *6 (S.D. Ohio Mar. 3, 2011).

As a female, Plaintiff is a member of a protected class.   Plaintiff protests not being hired for a zoning officer position and not being taken on as a police officer.   Defendants assert, however, that Plaintiff cannot demonstrate that she was "qualified" for any position to which she aspired.   To be qualified for a position, a plaintiff must have performed "at a level which met his

employer's legitimate expectations." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990); *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp*., 176 F.3d 921, 929 (6th Cir. 1999).   These qualifications, however, must be objective. *Upshaw v. Ford Motor Co*., 576 F.3d 576, 585 (6th Cir. 2009).   "Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." Id. at 576.

Plaintiff did not apply for the zoning officer position, leaving the claim of not being taken on as a police officer.   Plaintiff had neither completed nor been deemed exempt from the field training program.   The position description for full and part-time officers states an auxiliary officer must complete this program before she is eligible to be hired.   Plaintiff had not.

Plaintiff counters that some candidates have been deemed to have completed that field training program based on prior experience or a combination of reduced hours and prior experience, PageID 1291 (citing PageID 442, 864–65), but she does not claim that she had been granted this dispensation.

Officer Scott testified he trained fewer than twenty auxiliary officers during the course of his career with Clay Township. (Depo. of Scott, PageID 962). He testified he has not recommended every trainee he supervises. (Depo. of Scott, PageID 963).   Over the course of seven years prior to this lawsuit, the Clay Township Police Department did not offer full-time paid positions to approximately 13 individuals who began the Field Officer Training process. (See Responses of Clay Township to Plaintiff's Discovery Requests). Chief VanGundy testified the 240 hour requirement was applied to those officers who were unfamiliar with the jurisdiction and needed more time to learn the area or were generally inexperienced. (Depo. of Van Gundy, PageID 864).

Moreover, it does not appear that Silvers was similarly situated to those whose probationary periods were cut short. During Silvers's second tenure as Auxiliary Officer, she claims less qualified males were promoted to Police Officer and Zoning Officer positions. Silvers provides no evidence, however, from which a rational juror could make such a conclusion. See Doc. 42, PageID 1246 (citing Silvers Dep., Doc. 28-2, PageID 463, 464). A party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997)). Hearsay statements or statements lacking personal knowledge are to be ignored. Ibid.; see also *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997). Silvers's speculation about other officer's qualifications, without more, would be inadmissible.

Silvers contends that the Daily Observation Reports for her performance for almost a year remain largely unchanged. Doc. 28-3, PageID 627–52. This is true—they are regularly littered with assessments that she "needs improvement" in a variety of areas. *Id.*

In the context of a promotion, Plaintiff must demonstrate that other employees of similar qualifications who were not members of the protected class received promotions at the time Plaintiff was denied the promotion. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000). In a failure to promote sex discrimination case, "it is insufficient for a plaintiff" to merely "point to a man who received the job in satisfying the fourth prong." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 241 (6th Cir.2005). A person is not similarly situated just because they applied for the same position and their applications were reviewed by the same committee. Id.

13

"[I]t is incumbent upon the plaintiff to establish that she and the non-protected person, who ultimately was hired for the desired position, had similar qualifications." Id. citing *Williams v. Columbus Metro. Hous. Auth.,* 90 Fed. Appx. 870, 873 (6th Cir. 2004).   Plaintiff has not done so.

Here, there was a discrepancy in training and experience between the officers chosen for these positions and Plaintiff.   Moreover, with regard to the zoning position, Plaintiff failed to even apply for the position.   In addition, she admitted that the officer chosen for the zoning position had more experience at the department.   Because Plaintiff cannot set forth a *prima facie* case of discrimination under Title VII, summary judgment will be awarded to Defendants on Plaintiff's Title VII claim.

Even if Plaintiff had been able to satisfy her *prima facie* burden, her claim would still fail because she has no evidence to disprove the stated non-discriminatory reason for not hiring Plaintiff.   The officers chosen for those positions were more qualified than Plaintiff.   Plaintiff did not complete her field training and probationary period, and thus did not satisfy the standards. See *White*, 429 F.3d at 244–45.   There is no genuine issue of material fact as to whether the stated reason for denying Plaintiff either position was a pretext for intentional gender discrimination.

To establish pretext, "[t]he plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendants intentionally discriminated against [her]." *Upshaw*, 576 F.3d at 586 (internal quotations, brackets, and citations omitted).   An employer's explanation may not be rejected "unless there is a sufficient basis in the evidence for doing so. If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be found pretextual even if it was erroneous." Id. "[M]ere conjecture" that the "employer's explanation is a pretext for

intentional discrimination is an insufficient basis for denial of summary judgment." *Upshaw*, 576 F.3d at 587.

Moreover, as regards the discrimination claims against individuals, individual employees and supervisors cannot be held liable under Title VII. *Wathen v. General Electric Co.*, 115 F.3d 400 (6th Cir. 1997) (holding that "an individual employee/supervisor, who does not otherwise qualify as an employer, may not be personally liable under Title VII."). See also *Holden v. Atos Technical Solution*, No. 1:14-CV-914, 2015 WL 457746, at *2 (S.D. Ohio Feb. 3, 2015).

## IV.     Plaintiff's Sexual Harassment Claim under Title VII

Plaintiff's claims for sexual harassment are based upon a theory of a hostile work environment. (Doc. 23, ¶21–22, 24–25, PageID 248–49.)  To establish a claim for hostile work environment sexual harassment based on the conduct of a coworker, Plaintiff must demonstrate that (1) she is a member of a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the harassment unreasonably interfered with plaintiff's work performance and created a hostile or offensive work environment that was severe or pervasive, and (5) the employer knew or should have known of the charged harassment and unreasonably failed to take prompt and appropriate corrective action. *Minnich v. Cooper Farms, Inc.,* 39 F. App'x 289, 293 (6th Cir. 2002).  With regard to the third element, non-sexual conduct may only be illegally sex-based and properly considered in a hostile environment analysis where it can be shown that but for the employee's sex, she would not have been the object of harassment. *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999).

A hostile work environment only occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v.*

*Forklift Sys., Inc*., 510 U.S. 17, 21 (1993).  Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive. See id. at 21–22.  Simple teasing, offhand comments, and isolated incidents, unless extremely serious, do not give rise to an actionable claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  When determining whether the alleged harassment is sufficiently severe or pervasive, the court must consider the totality of the circumstances. *Williams*, 187 F.3d at 562.  "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether taken together-the reported incidents make out such a case." Id.  This determination is reached considering "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Finally with regard to the last element, an employer's liability for hostile work environment harassment varies depending upon whether the alleged harasser is a supervisor or a coworker.  When the alleged harasser is a supervisor, the employer may be vicariously liable. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763–765 (1998).

Plaintiff's Second Amended Complaint accuses VanGundy of two incidents – the incident in his office where prior to being appointed as Auxiliary Officer, VanGundy said she would have to "put out" if taken on and the "pissing blood" incident.  The first of these incidents, an unfulfilled *quid pro quo* demand, is part of Plaintiff's hostile work environment claim. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) ("Because Ellerth's claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of

severe or pervasive conduct.").   Plaintiff also asserts Scott on "numerous occasions" mimicked

her saying, "My name is Tina and my pussy hurts."   She alleges that he called her an "idiot,"

modified with an expletive.   She claims that he mocked her weight loss, recalling Plaintiff's

sister's death from cancer.   She claims that he crassly used a metaphor concerning personal

hygiene.   She describes that he spoke with expletives to her on her last day.   All of this over the

course of nearly a year.

The Court is mindful that, rather than considering each event complained of in isolation, it

must consider the totality of the circumstances in determining whether the harassment was

sufficiently severe and pervasive. *Black v. Zaring Homes, Inc*., 104 F.3d 822, 826 (6th Cir.1997).

Specifically, the Court must consider "the frequency of the discriminatory conduct; its severity;

whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether

it unreasonably interfere[d] with an employee's performance." *Harris*, 510 U.S. at 23.   "[S]imple

teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 788 (1998).   The Court may consider the effect of the incidents on the

employee's psychological well-being. *Harris*, 510 U.S. at 23. *Randolph v. Ohio Dep't of Youth*

*Servs*., 453 F.3d 724, 733 (6th Cir. 2006).   Even incidents occurring consistently over a period of

four months, are "merely offensive" and are insufficient to support liability. *Black v. Zaring*

*Homes, Inc*., at 826; see *Burnett v. Tyco Corp*., 203 F.3d 980 (6th Cir.2000); see also *Bowman v.*

*Shawnee State Univ*., 220 F.3d 456, 463–65 (6th Cir. 2000) and *Mahan v. Peake*, No. 07-15223,

2009 WL 174130, at *6 (E.D. Mich. Jan. 23, 2009).

Considering all of the incidents Plaintiff describes as allegations of sexual harassment, they

simply do not rise to the level of severe or pervasive necessary to succeed on a cause of action.

There is no evidence that Plaintiff's interactions on the highway would not have occurred "but for" Plaintiff's gender. See *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) ("[plaintiff] 'must show that but for the fact of her sex, she would not have been the object of harassment.' *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)"). On its face, the highway incident was a supervisor upset at his trainee.

Similarly, Plaintiff has not pointed to a single incident wherein a male employee was treated differently after the death of a loved one. While exceedingly boorish, it has not been linked to Plaintiff's gender. Neither are crass metaphors concerning how one cleans oneself necessarily motivated by gender.

Silvers does assert that male officers were not treated as poorly as her, basing this on her observing Scott yell at Officer Hodge a few times. This, however, is actually similar to what she describes of herself. Silvers Dep., Doc. 28-2, PageID 556. Moreover, absent a foundation of misconduct or under-performance in her presence, there is a lack of personal knowledge on Silvers's part regarding what transpired between Scott and other officers outside of her presence.

Even if these incidents were gender motivated, combining them with Plaintiff's other comments, including VanGundy's insistence that Plaintiff "would have to put out" if hired and Scott's incessant incantation, "My name is Tina and my pussy hurts," they do not rise to the level of a hostile work environment.[3]

---

[3] C.f. *Randolph v. Ohio Dep't of Youth Servs*., 453 F.3d 724, 734 (6th Cir. 2006) ("Randolph has easily satisfied her burden to produce evidence from which a hostile work environment can be found. As noted above, Randolph testified that she was subjected to daily verbal harassment and threats and produced evidence corroborating her testimony. Additionally, Randolph testified that she was subjected to multiple physical attacks and produced evidence corroborating her testimony. These events would certainly be traumatic to any individual and were clearly traumatic to Randolph, based on her evidence that they caused her to become suicidal and necessitated institutionalization and counseling.").

If there had been a hostile work environment, the Board of Trustees would seek to avail itself of the *Faragher*/*Ellerth* affirmative defense. To prevail on the affirmative defense, Clay Township must prove by a preponderance of the evidence that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and that the plaintiffs "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [Clay Township] or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. This defense requires Clay Township to prove that it acted reasonably to prevent and correct harassment, *Clark*, 400 F.3d at 349, and because Clay Township "is in the best position to know what remedial procedures it offers to employees and how those procedures operate," both *Faragher* and *Ellerth* "place the burden squarely on [Clay Township] to prove that [Plaintiff] unreasonably failed to avoid or reduce harm." *Pa. State Police v. Suders*, 542 U.S. 129, 146 & n. 7 (2004). *Shields v. Fed. Exp. Customer Info. Servs. Inc.*, 499 F. App'x 473, 477–78 (6th Cir. 2012).[4]

Clay Township points to its policy requiring incidents be reported, and that the only incident of which the Board of Trustees was ever made aware was the highway incident, and Scott was demoted as a result of the allegation. Plaintiff was given manuals setting forth the policies and procedures for reporting harassment or discrimination, PageID 487–89. The policy stated that an employee who believes that he or she has been subject to sexual harassment should report the facts to the Board of Trustees for Clay Township immediately. PageID 488 & Ex. H. However, when VanGundy and Scott took over before Simmons came in, they claimed to have

---

[4] Plaintiff has filed "Plaintiff Tina Silvers's Motion for the Court to Disregard Portions of Doc. 45 That Exceed the Scope of Doc. 38 (Clay Township and VanGundy's MSJ) and Doc. 43 (Silvers's Memorandum in Opposition); Objection to Evidence in Support of Doc. 45; and Alternative Motion to File Sur-reply." The Court notes that Plaintiff did not attach a proposed sur-reply, making it difficult to grant such relief at this late date. The Court's ruling renders the motion, at least in part, moot. In any event Defendants' Answer raises the *Faragher/Ellerth* defense and Defendants' motion for summary judgment discusses Plaintiff's failure to afford herself of the benefits of the Township policy sufficiently that the Court was searching Plaintiff's Response for a response.

changed the policy so that an officer wishing to speak to the Board of Trustees had to submit a form to them requesting permission to go to the Board of Trustees meeting.   PageID 387–388.

Silvers did not alert the Trustees of her alleged issues. See Doc. 28-1, Silvers Dep., PageID 387, 391; Doc. 28-2, Silvers Dep., PageID 450, 462–63, 472, 488.   Instead, she twice filled out a request, seeking permission to speak to the Trustees. PageID 388.   Each time she was denied. Id.

According to Clay Township and VanGundy, there was nothing stopping Plaintiff from picking up the telephone and talking to a trustee or attending a meeting or writing a letter. Doc. 45 at PageID 1372.   They somehow ignore the testimony that Plaintiff was instructed that she needed permission to speak to the Board of Trustees, that she sought this permission, and that it was denied her.

The *Faragher-Ellerth* plan places duties on employers and employees designed to stop sexual harassment before it reaches the severe or pervasive stage. See *Ellerth*, 524 U.S. at 764. That design works only if employees are able to report harassment promptly, earlier instead of later, and the sooner the better.   Thus, when an employee complies with the reporting rules and procedures her employer has established and her complaint does not reach responsible ears, the defense is not available.

## V.     Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." *Schroeder ex rel. Schroeder v. Maumee Bd. of Educ*., 296 F. Supp. 2d 869, 874 (N.D. Ohio 2003).   But, only intentional, purposeful discrimination violates the equal protection clause. *Id*. citing *Washington v. Davis*, 426 U.S. 229, 243 (1976).   A plaintiff must prove "that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Henry v. Metro.*

*Sewer Dist.*, 922 F.2d 332, 341 (6th Cir.1990).   To make out such a claim, a plaintiff must prove that she suffered purposeful or intentional discrimination on the basis of gender. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977).   "[T]he showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section § 1983." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988); *Lautermilch v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir. 2003).   Thus, as with Plaintiff's Title VII claim, Plaintiff cannot show that she was treated differently based upon her gender and as such, her claim fails.

If Plaintiff were to have an Equal Protection claim, the individual defendants claim they are entitled to qualified immunity on Plaintiff's equal protection claim.   The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability as long as they could have been thought that their actions did not violate the rights they are alleged to have violated. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   Even if a government official deprives a plaintiff of a federal right, "qualified immunity will apply if an objective reasonable officer would not have understood, by referencing clearly established law, that his conduct was unlawful." *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir.1999).

Once the defense is raised, the plaintiff has the burden of demonstrating a violation of a constitutional right and showing that the right was clearly established. *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004).   This inquiry will turn on the circumstances of the case compared to prior precedent. *Poe v. Haydon*, 853 F.2d 418, 425 (6th Cir. 1988).   Ordinarily, these questions can be answered by the court as a matter of law. See *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir.1996), *Schroeder v. City of Vassar*, 371 F. Supp. 2d 882, 896 (E.D. Mich. 2005), *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

Plaintiff does not point to any case law that would put Defendants on notice the alleged conduct was not merely boorish, but clearly established as an actionable hostile work environment. Thus, the individual Defendants would be entitled to qualified immunity.

As for the Equal Protection claims against Clay Township, a political subdivision cannot be liable under a *respondeat superior* theory for § 1983 violations. *Spears v. Ruth*, 589 F.3d 249, 256 n.6 (6th Cir.2009) citing M*onell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978).   Rather, these entities are liable only when they "have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Cash v. Hamilton County Dept. of Adult Proba*tion, 388 F.3d 539, 542 (6th Cir.2004) quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988).   A §1983 plaintiff can draw from one of four sources to establish a municipality's liability for an illegal custom or policy: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." Spears, 589 F.3d at 256 (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).   A plaintiff bears the burden of showing "that the unconstitutional policy or custom existed, that the policy or custom was connected to the [municipality], and that the policy or custom caused [the] constitutional violation." *Napier v. Madison Cnty.*, 238 F.3d 739, 743 (6th Cir.2001).

Here, Plaintiff must prove that the training or supervision was inadequate; that the inadequacy was the result of Clay Township's deliberate indifference; and that the inadequacy was closely related to or actually caused injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

22

Here, Plaintiff cannot present sufficient evidence to demonstrate that she was subjected to sexual harassment or that there were any legislative enactments or policies in place tolerating sex discrimination. See *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576–77 (6th Cir. 2004); *Delozier v. Bradley Cty. Bd. of Educ.*, 44 F. Supp. 3d 748, 768–69 (E.D. Tenn. 2014).   Clay Township had a policy specifically prohibiting discrimination. Thus, Clay Township is also entitled to summary judgment on Plaintiff's equal protection claim.   Plaintiff has not produced evidence that would support a *Monell* claim.

## VI.     Conclusion

Because Plaintiff has no direct evidence of Title VII sex discrimination and can neither establish a *prima facie* case of discrimination nor disprove Defendants' articulated non-discriminatory reasons for not promoting and eventually dismissing Plaintiff, summary judgment is **AWARDED** on this claim.   Because Plaintiff has not described incidents which, taken together, describe a situation that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, summary judgement is **AWARDED** on Plaintiff's Title VII sexual harassment claim.   Because Plaintiff cannot show that she was treated differently based upon her gender, and because the individual Defendants are entitled to qualified immunity and because Plaintiff cannot present sufficient evidence of legislative enactments or policies in place tolerating sex discrimination, summary judgement is **AWARDED** on Plaintiff's Equal Protection claim.   Because Plaintiff has failed to adduce evidence of a Title VII sexual harassment claim and because the Court has found that Defendants would not prevail on their invoked *Farragher/Ellerth* defense, Plaintiff Tina Silvers's Motion for the Court to Disregard Portions of Doc. 45 That Exceed the Scope of Doc. 38 (Clay Township and VanGundy's MSJ) and Doc. 43 (Silvers's Memorandum in Opposition); Objection to Evidence in

Support of Doc. 45; and Alternative Motion to File Sur-reply, Doc. 48, is **MOOT**.

Motion for Summary Judgment by Defendants Board of Trustees of Clay Township, Clay Township, John VanGundy, Doc. 38, is thus **GRANTED IN PART**, as Plaintiff's federal claims against Board of Trustees of Clay Township, Clay Township, John VanGundy have been dismissed. Similarly, Motion for Summary Judgment by Defendant Anthony Scott, Doc. 39, is **GRANTED IN PART**, as Plaintiff's federal claims against Anthony Scott have been dismissed. And finally, Motion for Summary Judgment by Defendant John Simmons, Doc. 40, is **GRANTED IN PART**, as Plaintiff's federal claims against Anthony Scott have been dismissed.

Plaintiff's remaining claims are based on state law. The Court remands these claims to state court pursuant to 28 U.S.C. § 1367(c)(3) and *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (noting that generally "if the federal claims are dismissed before trial, ... the state claims should be dismissed as well"). The Court notes that it has discretion to hear or remand state claims after the federal claim has been dismissed, but declines to exercise this jurisdiction. The Clerk is **ORDERED** to **REMAND** the instant action to the Court of Common Pleas of Montgomery County, Ohio. The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Friday, October 28, 2016.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE